REGAN, Judge.
The plaintiff, Lancaster Parker, a common laborer, 62 years of age, instituted this suit against the defendant, Armour & Company, Ltd., his employer, endeavoring to recover workmen’s compensation at the rate of $29.60 per week for a period of 400 weeks, subject to a credit of 36 weeks compensation previously paid, for total and permanent disability, resulting from a broken wrist incurred on March 11, 1953, when a heavy “pan” of meat which he was assisting in unloading from a boxcar accidentally “jammed” his wrist against the side thereof causing the above injury.
The defendant answered and admitted the occurrence of the accident and the resulting injuries to plaintiff’s wrist, but asserted that the plaintiff had fully recovered therefrom as of December 15, 1953, the date of his discharge by defendant’s physician.
From a judgment awarding plaintiff compensation at the rate of $8.89 per week for a period not to exceed 200 weeks, subject to a credit of $1,050, plus $150 for expert’s fees, plaintiff has prosecuted this appeal. Defendant has answered the appeal asserting that plaintiff has already received all compensable disability benefits to which he is legally entitled and, therefore, his suit should be dismissed.
The record reveals that on March 11, 1953, plaintiff was engaged in removing *574 “pans” of meat from a-boxcar. The “pan” was a large one, 7 feet by 4 feet, mounted on wheels, 4 feet in height and contained approximately 1,000 pounds of meat. In endeavoring to roll the “pan” from the boxcar, its wheels somehow became obstructed and when plaintiff and a fellow employee forcefully endeavored to free the “pan” it loosened unexpectedly and jammed plaintiff’s wrist against the side of the boxcar causing it to fracture.
Plaintiff was then instructed to visit -the office of defendant’s physician, Dr. Robert A. Robinson, a general surgeon, who, after x-raying the injury, related “I reduced the fracture, and placed it in splints, plaster of Paris, mechanical devices used to immobilize the fractured site, which included the arm, elbow, wrist and hand.” He treated plaintiff again on March 13, 16, and 27th, and, on the latter date, which was sixteen days after the casting of the wrist, it was removed, the wrist was bandaged and a sling provided for the arm “for the purpose of beginning physiotherap/ty measures.” On March 30, 1953, the plaintiff returned to the physician’s office with his left wrist and forearm in an improvised splint wrap-, ped in bandages and complained of extreme pain in the hand and wrist. Dr. Robinson became, as he said, “suspicious of this hand and sent plaintiff to the Baptist Hospital for an x-ray on the 31st day of March”, which, according to Dr. Robinson, disclosed a secondary fracture in the same location. Plaintiff admits he improvised a splint to relieve the pain, but denies that he ever re-injured his wrist at any time or in any manner whatsoever, particularly between the time the cast was removed on March 27th, and the day of his visit to the Doctor, March 30, 1953. Dr. Robinson explained “that since the plaintiff refused reduction of this particular fracture * * * I, therefore, immobilized this fracture again for a period of two weeks, then removed the splints and advised him to go for physiotherapfiy measures again as a compromise for his refusal of any manipulative reduction of this particular fracture.” Incidentally, we have been unable to discover any evidence in the record to show that the plaintiff was ever cognizant that such a decision, relative to a “reduction” of the secondary fracture had even been posed for his acceptance or rejection by Dr. Robinson. Dr. Robinson continued to see the plaintiff six or seven times a month and, in July of 1953, he instructed him to return to his former employment and “attempt to use that hand because fractures of that nature, left untreated by active mobilization, will acquire a stiffness, and the earlier you rehabilitate the involved part, the better the prognosis is for ultimate recovery.” Although plaintiff was in pain he acquiesced therein and returned to the same occupation on July 23, 1953, where he endeavored to do lighter work until August 7, 1953, but he related “this hand could not do this work * * * and I stopped work” after informing Minter H. Baumy, defendant’s superintendent, of the pain, who then referred him to Dr. Robinson. He continued to visit the offices of Dr. Robinson and, on December 16, 1953, he was discharged by this physician with what he termed an “ultimate” disability of 5 to 8 per cent, at which time compensation likewise ceased.
Dr. Robinson, itpon being interrogated “Would you have discharged him ’if you felt that-he could not do the normal duties of a common laborer without pain”?, responded “No, I expected him to have pain for two or three years after the treatment of this type of fracture, when under stress and strain, but inactivated, sitting around in a sedentary way, I don’t think he would have pain.” He was then asked a more pertinent question:
“Q. How about doing ordinary,' normal labor jobs? Do you think pain would discommode him any? A. It would possibly discommode him in the first year or year and a half, but after that, we have patients who have marked physical defects that are doing heavy manual labor without pain.”
The Court at this point interposed itself and interrogated Dr. Robinson:
“Q. * * * while he was working, he would be in pain? A. Oh, definitely, yes, sir.”
*575 .-The purpose of this painful labor, according to Dr. Robinson,-..as we have related elsewhere hereinabove,- was that laboring in pain would provide a sort of therapy which would .facilitate the rehabilitation of the plaintiff’s arm and wrist.
Dr. William S. Neal.-also appeared on behalf of defendant, as an expert in Radiology, and simply discussed the existing difference between the x-rays of March 11 and 31, 1953.
Dr. George Battalora appeared on behalf of plaintiff as an expert in orthopedics and related that he could exert a pressure or “grip” of 100 pounds with the left arm or hand as compared with a pressure or “grip” of 240 pounds with the right or uninjured hand — a diminution in strength of approximately sixty percent. He stated that the x-rays also revealed considerable bone damage to the wrist which he estimated to be thirty percent permanent partial, which was predicated upon plaintiff’s ability to use the arm. He further asserted that if the plaintiff attempted to do work involving the use of the injured wrist there would be pain and continued use thereof would involve and aggravate both the pain and the condition of the wrist.
Dr. Irwin Cahen also appeared on behalf of plaintiff as an expert in orthopedics and related that he had developed traumatic arthritis and had incurred a loss of the use of the injured arm of twenty to twenty-five per cent permanent, based upon the bone changes, separation of the joint, and arthritic changes within the small bones. He believed that the condition of the wrist would prevent plaintiff from doing heavy work, but that he could use it when engaged in ordinary activity. He also expressed the opinion that if he engaged in heavy or laborious work it would cause pain to the wrist after the use thereof and that it would “also show swelling of the wrist joint * * * he would probably show some muscle spasm as nature’s attempt to restrict the rotation at the wrist, because that is the separation of this joint.” Upon being informed that part of the plaintiff’s duties were to push a hand truck weighing, perhaps, one or two thousand pounds, assisted by another employee, he finally expressed the opinion that if the plaintiff did- this • he wo'uld probably have pain and a swelling of the wrist.
The testimony of Drs. Battalora and Cahen, whose recall as expert witnesses was necessitated in order to rebut the unexpected defense of a secondary fracture of the wrist, not previously pleaded, is also quite pertinent.
Dr. Battalora testified that an immobilization period of sixteen days would not insure a very strong union (plaintiff’s cast was removed sixteen days after the fracture) and that vertically any force applied to the wrist at that stage of the injury would have destroyed the reduction. Upon being interrogated “ * * * can you tell from an inspection of those -plates (x-rays taken at the time of the primary and the alleged secondary fracture) whether there is any additional damage shown to the wrist as compared with the initial plate?” responded “No. This is the same injury, although the direction of the displacement now is anteriorly in the distal fragments. In the original plates the displacement .was posteriorly; but the fracture lines are identically the same, going through the same part of the bones.” Dr. Battalora also asserted that proper treatment of this fracture did not include removal of the cast within sixteen days, but related that the usual period of immobilization was about six weeks and, therefore, the union was not secure enough to withstand, any amount of strain.
Dr. Cahen, in rebuttal, corroborated all of the essential aspects of' Dr. Battalora’s testimony and, in reply to a question as to the amount of trauma necessary to cause loss of reduction in a fracture after sixteen days of immobilization, responded that “the loss of reduction could come from minor trauma or from muscular contraction alone” and, in explaining this, asserted
“In fractures of bone there is a certain degree of irritation that occurs at the fracture line through motion. *576 Nature, in an effort to splint that, must produce muscle spasms or con-tractility of the muscle. Such spasms, if uncontrolled in relation to immobilization of bone fragments, will cause displacement. In cases of this type it has been my experience that, unless the bone is fixed, that the muscular contraction which occurs during the phase of healing can displace bone.”
Dr. Cahen was also of the opinion that the proper period for immobilizing a fracture of this type in a cast, considering the plaintiff’s age of approximately sixty years, should be a minimum of 6 weeks to the maximum of 12 weeks.
In addition to the foregoing expert testimony there appears in the record the lay testimony of plaintiff’s wife, Georgiana Parker, his son, August Parker, and Tommy Magee, his son-in-law, who, in substance, testified that plaintiff could use the injured arm only as an adjunct to the uninjured arm.
The initial question posed for our consideration is one of fact and that is did plaintiff deliberately refuse to follow the treatment prescribed by Dr. Robinson and permit him to “reduce” or “reset” the secondary fracture irrespective of whose fault caused it to occur?
The burden of proving this assertion was, of necessity, to be borne by defendant and our examination of the record fails to disclose that this defense was ever pleaded or proven by the defendant. In fact, we have failed, as observed hereinabove, to discover any evidence indicating that plaintiff was even cognizant of having been offered a choice or the opportunity of accepting or rejecting Dr. Robinson’s advice. Therefore, we find no merit in this contention, however, the record abounds with evidence to the effect that good orthopedic practice was violated by defendant’s physician in removing the cast too soon which probably accounted for the displacement of the bone.
The fundamental question posed for our consideration is likewise one of fact and that is whether the plaintiff has incurred by virtue of his fractured wrist, a permanent partial or permanent, total disability?
It is our opinion that the injury incurred by the plaintiff has resulted in permanent, total disability.
In several relatively recent opinions of this Court we have had occasion to remark that whenever the experts are in substantial disagreement they are of little aid to the Court and, therefore, we must decide the case on the record as a whole. However, it is rare indeed where the record reveals agreement between the medical experts appearing on behalf of plaintiff and defendant as is evidenced by the following testimony. Dr. Robinson, defendant’s physician, related that he expected the plaintiff “to have pain for two or three years after the treatment of this type of fracture” and, in the performance of “ordinary, normal labor” pain “would possibly discommode him in the first year or year and a half * * * ” and, in the final analysis, he asserted that the plaintiff would definitely experience pain in the performance of his laborious duties for a period of from one and a half to three years.
Dr. Battalora, plaintiff’s physician, was of the opinion that if the plaintiff attempted work involving the use of the injured wrist, there would be pain and continued use thereof would both involve and aggravate the pain and the condition of the wrist.
Dr. Cahen, also plaintiff’s physician, was of the opinion that if the plaintiff engaged in heavy or laborious work it would cause pain to the wrist after the use thereof and that swelling of the wrist joint would occur together with muscle spasm as nature’s effort to restrict the rotation of the wrist.
We do not intend to convey the impression that some conflict did not exist in the medical testimony with respect to the percentage loss of plaintiff’s use of the injured member for this is to be expected *577 because of the very nature of medicine as an inexact science, but the answers given by the medical experts in response to pertinent questions directly bearing upon the issue “of pain” were in accord.
The record discloses that prior to his injury plaintiff possessed a good and enthusiastic work record, however, since the injury to his wrist, he has only been able to earn, together with the assistance of his wife, about $24 or $25 per week as a “mar-chand” or vendor of “fried pies.”
In the case of Brannon v. Zurich General Accident & L. Ins. Co., 1953, 224 La. 161, 69 So.2d 1, 3, the Supreme Court, in awarding total permanent disability to an injured workman, stated “The law does not expect, and it does not contemplate, that a worker, in order to make a living, must work in pain * *
In the case referred to hereinabove, while it is true that the injured employee was one designated as a “skilled laborer”, we think that the rationale expressed in the rule enunciated therein, applies with equal facility to a “common laborer.” In this connection in Scott v. Fulton Bag & Cotton Mills, La.App.1953, 65 So.2d 397, 401, we expressed our opinion thereof as follows:
“ * * * even in the case of a common laborer as distinguished from a skilled laborer, whenever the injuries make it impossible for the laborer to perform a substantial number of the functions which were normally required, the injuries have produced inability to do work which was formerly done — in other words, to do ‘work of any reasonable character,’ and that, as a legal result, the employee is entitled to compensation for permanent total disability.
“It is recognized, in the case of the skilled laborer, that since a period of training and learning have developed a special ability to do a particular kind of work, or to operate a particular kind of machine, if the injury which has been sustained makes it impossible for the employee to continue doing that particular kind of work, or some work very similar to it, or to operate some particular kind of machine or tool, or some machine or tool closely resembling it, the employee can no longer do work of any reasonable character.
“In the case of the common laborer, there are so many different kinds of work which may be done that ordinarily total disability does not result, if the injury causes disability to do any particular kind of work if the employee, in spite of the injury, may still successfully do what is required in a large number of other occupations requiring only common labor. But where the injury is such that the employee is prevented from undertaking a substantial number of the different operations ordinarily open to a common laborer, we think that he is totally disabled and as such is totally disabled just as the skilled laborer who is prevented from undertaking any work substantially similar to that in which he was-formerly engaged.”
For the reasons assigned the judgment appealed from is amended and it is now ordered that there be judgment herein in favor of the plaintiff awarding him compensation at the rate of $29.60 per week for a period not exceeding 400 weeks, subject to a credit of 36 weeks for compensation already paid, and, as thus amended, it is affirmed.
Amended and affirmed.